May it please the court, my name is Lester Marston. I'm the attorney representing Jessica Jackson, the appellant in this case, and I'd like to reserve four minutes of my time for rebuttal. All right, watch the clock, counsel. Did you have Oh, it's on the other side that it says Okay, splitting time. We sought to hold the federal officials in this case in contempt of the district court's final judgment and order. The order that was entered in 1979 and the order that was entered in 1983. And what did the judgment say? In order to understand the judgment, I have to give you a little bit of history about how the judgment came about. Well, we know the facts, counsel, in this case, so you have limited time, so probably it's better for you to just get into your argument, because we're aware of the facts and the trust status and the request, the order that the government didn't fulfill its obligations, so we're aware of all of that. Thank you, Your Honor. So I'll be brief. So the breach, the violation of federal law, was the government taking the reservation land out of government ownership and giving it to the Indians. So the district court used its inherent equitable authority to fashion a remedy. Well, it wasn't exactly taking it out of the Indians. It was not fulfilling all the conditions that went with taking the, well, I won't quibble about that, but that's neither here nor there in terms of Ms. Jackson's claim. Well, see, I guess I would say, I do not think that the question before the district court was whether the BIA should have granted McLeod's conveyance request, but rather whether Jackson proved by clear and convincing evidence that, one, the BIA violated the 1979 order, two, beyond substantial compliance, and three, not based on good faith and reasonable interpretation of the order. That's what I see as the issue. Well, they did. If they refused to take the property into trust and the judgment... Well, but that's what I see as the issue. Right. Only if they had an obligation to take that particular parcel back into trust, because we're beyond the initial... And they did. And they did. Okay, where was the obligation to take that particular parcel back into trust? Section paragraph 8F of the judgment that placed a continuing obligation on the United States government to put back into trust any property that an Indian of the Rancheria, who was listed in the distribution plan, who still had an ownership interest in the property, requested that the government put back into trust. Because, remember, the judgment, what the court was trying to do was void the termination process. So the court wanted to give the Indians the option, not the government the option, the Indians the option, to void the termination and put the property into trust. But there were... Go ahead. Oh, I was just going to say the government could not take, the BIA could not take the property back into trust because Ms. Jackson did not kindly attempt to convey it and never asked for an extension. That's not correct. The facts of the case are this. Amardeen Jackson, within one year from the date of the entry of the judgment, exercised her option and requested that the property be returned to trust status. At that point, the Bureau had a mandatory non-discretionary duty to put the property back into trust. They prepared the deed, sent it to Ms. Jackson for her to date it and sign it and return it to the trust. Unfortunately... Wasn't there, in 1981, is that where you're talking about? In 1981, the BIA mailed the grant deed, it said, but she allegedly didn't receive the grant deed? Is that where you're talking about? Yes, but you're slightly mistaken. She made her election. The government sent her a deed. And after the government sent her a deed, she changed her mind. She didn't change her mind to put the property into trust. She changed her mind as to who she wanted the property to go into trust for. Instead of her and her husband, she wanted the property to go into trust for her two daughters and reserve a life estate. Well, I thought the record was that the BIA never received a signed grant deed... No. ...from MacLeod. No, that's not true, Your Honor. The record... It was untimely. No. If I can explain, the judgment gets entered. The Indians have one year to make their election. Right. Ms. Jackson makes her election within the one year time period. And what was supposed to happen after she made her election? The government prepares a deed, says, Amardine Jackson grants to the United States of America in trust to Amardine Jackson and her husband, because that was the election she made. I thought her name was MacLeod. Amardine Jackson MacLeod Snow, to be exact, Your Honor. She was married three times. I used Jackson because I was hoping it would be easier for the court. Well, that's confusing with the plaintiff. That's confusing because isn't the daughter Jackson as well? Yes, Jessica Jackson. That's why I used Jackson. I thought it would be easier. I used MacLeod for the mother, Jackson for the daughter. So Amardine MacLeod made her election. The government sent her the deed. And as I said, if she would have signed it and dated the deed and sent it back to the government, the government would have accepted it properly and would have given trust. So what happened was she got the deed and she decided she didn't want to convey it back to her back to herself and her husband. She wanted to give it to her two daughters. So she sat on the deed. Right. Okay. But she had made her election within the one year time period. But if you don't effectuate that, well, the election is not made. So so that the one year time period, the only relevance of the one year time period is that once the one year time period expires, the county can start taxing the property again because it's in fees. And the government no longer has a mandatory duty to pay for the costs to put the property into trust. They still have a mandatory duty to take it into trust. That's their continuing obligation. So when Amardine Jackson went back into California Indian Legal Services to Mr. Rapport and said, I want to convey it to my daughter, he prepared the deed. She signed it. She sent it up. She the BIA got the deed. And Mr. Rapport said, you have a continuing obligation to take this property into trust. The BIA agreed. Virginia Carpenter, the realty officer, said, yes, we'll take it into trust. Then they said, oh, wait a minute. You have to pay the taxes. You got to pay the taxes. And so Amardine Jackson contested that. She took an administrative appeal. That took time. But ultimately, the Interior Board of Indian Appears ruled against her and said, BIA, you got to take the property in trust. But you don't have to pay for the taxes or for any of the other costs that would have to be incurred in order to put the property into trust. Amardine Jackson was going to pay the taxes, send them up. She died. Right. Right. Okay. You keep telling me that I'm wrong, but I apologize. No, no. Okay. Look, I don't take it as disrespect. And we're here to have a discussion and I respect you and I appreciate what you say to me and I'm not. But the problem that I see is that there was a lot of this sort of back and forth and noncompliance, not just by your client's mother, but by the BIA as well. Ms. Jackson McCloud received the 79 order November 23 of 1981, waited a year to send the letter to the Bureau of Indian Affairs requesting the restoration of Parcel 5 to trust status. Now, that was a year, that was more time than she was entitled to. And notwithstanding that, as you say properly, the BIA did prepare a grant deed and sent it to her with the instructions for her to complete it. Now, all this other stuff that you just mentioned did happen with the taxes and the additional time, but the BIA didn't get the executed grant deed to restore the parcel until January 25, 1988, more than four years after 1983's judgment and nine years after the 79 order. So even though everything you say is true, legally the district court didn't have any time compliance from Ms. Jackson McCloud to look at when entering the order of dismissal. That's not true. There was no time period. Look at the judgment. There's no time period in the judgment for an Indian to exercise their option to put their property into trust. In fact, if you read the judgment, it makes it very clear that at any time in the future, an original distributee or dependent member, an Indian of the reservation, acquires title to the land, goes back into the private marketplace and buys a piece of property on the reservation. They can exercise their option and request that the government take the property into trust, and the government has a mandatory continuing obligation to do so. They just don't have the obligation to pay for the costs associated with doing that. At any time, absent any communication that the client needs more time or an extension, at any time this can happen? Yes, even now. Even now under the judgment. And so Jessica Jackson, when she found out that the property wasn't in trust, she thought it was in trust because her mother told her she was, and her mother gave her a copy of the deed. She didn't know the BIA hadn't accepted it. She came in to see me. And so we went to the Bureau of Indian Affairs, Troy Burdick, the superintendent of the Central California Agency, and we requested under paragraph 8F, under the government's continuing obligation, that they take the property into trust. Then that brings us to the probate complication. Well, no, there wasn't any probate complication. Let me just finish my thought and I'll address that issue, Your Honor. So Troy Burdick came back and said, okay, Ms. Jackson, we have a continuing obligation. We'll put the property into trust, but you've got to pay, you've got to clear the property taxes and do everything else. If you look at the judgment, the judgment provides for that. It says that, you know, the Indians in the government are free to enter into agreements to accomplish a trust restoration. And the government and Ms. Jackson entered into a series of agreements. That process lasted seven and a half years. During the course of that seven and a half years, the government, not once, not twice, not three times, but four times, assured Ms. Jackson that they were going to accept the deed, provided that Ms. Jackson paid for the cost. And reliance on those representations, to her detriment, she reached into her pocket. And she's not a rich person. She's a poor Indian. She reached into her pocket. She paid the back taxes up, not once, not twice, but three times, because every time she paid the back taxes to clear it, the government would kind of sit and take its time or there would be turnovers and more taxes would accrue. But she paid the taxes. She paid for the preliminary title report. She paid to have the property evaluated so that the title insurance company could issue the title insurance policy. She hired her lawyer to go into state court to make sure that the state court judge knew that this process was occurring, that the state court could not exercise jurisdiction over the property. A powerful argument, and your client presents very sympathetically. So I ask you, does the government have dirty hands when it comes to court today to rely on these time limits? Yes, I think they do. This is the dirty hands. They shouldn't have, first of all, Amardeen Jackson made a timely election. That placed the duty on the government under the judgment. Yes, it took time for her to change who the grantees were and to get the deed back up, but there's no time limit in the judgment on the Indians exercising their option. Once Jessica Jackson came to them and made the request, if the government wasn't going to put the property into trust and accept the deed, then they shouldn't have said they were. They repeatedly told her, yes, we're going to take the property into trust. In fact, the government got ready to take the property into trust, and they weren't sure whether the National Environmental Policy Act applied to the fee-to-trust transfer. So they went to their solicitor's office, and they said, is this a mandatory acquisition under the judgment, or do you have discretion? The solicitor came back and said, this is a mandatory acquisition. The Department of Interior itself interpreted the judgment the way we interpreted the judgment. Also, did you want to save any time for rebuttal? I did. I'll just finish my statement. They said, we're going to take the property into trust, and we'll tell you in 30 days how long it's going to take us to do it. They came back and said, we'll put the property into trust in 90 days, and then they turned around and refused to take the property into trust. Yes, the government did not meet its fiduciary obligations. Thank you, counsel. Good morning. May it please the Court, my name is Michael Pyle. I'm an assistant United States attorney. I represent the United States and the federal government appellees. And we believe the district court made a dispositive factual finding that at the time McLeod died in 2001, the property was held by her in fee. It was not in trust with the United States. There's overwhelming evidence in the record to that effect. The opposing counsel's argument is that it should have been in fee. The government was obligated to take the property in trust. And so de facto it was trust land. So what's your response to his argument? The response is, as the district court recognized, there is no such thing as a unilateral Indian decision to put property in trust. It must be accepted by the United States. Didn't the government, like, sit around for two years and then do nothing, and then it went into the whole problem of then there's the taxes and then there's this? The problem we have is we're talking about decisions and things that happened in the 1980s, and the only evidence I have about what happened then is in a brief that McLeod filed administratively, which lays out her version of her alleged election and the efforts and the fact that she changed her mind about what she wanted to do. And so there was a long delay. But it appears in 1988 she did everything she was required to do to trigger the secretary's legal obligation to restore the parcel. She did not. And so what's your best argument why the district court did not abuse its discretion with respect to the 1988 conveyance? Because the 1988 alleged conveyance, it was not effective, and that was litigated administratively within the agency. The agency ruled against Ms. McLeod. McLeod never appealed that further administratively to the Interior Board of Indian Affairs and didn't file a timely lawsuit or go to court. So what was the purpose of the 1993 stipulated judgment? The 1993? Wasn't there a stipulated judgment in 1993? There's a 1979. There's a 1983, which we believe the 1983 judgment is the operative judgment in terms of our obligations. And then there's a 93 court order regarding some other proceedings that, again, just provides context for the litigation. But it's really the 1983 judgment that sets the obligations and rights and responsibilities of the parties. So it's your position that unless the government formally accepts the property, it is still in fee to the individual? Correct. And the agency was transparent about this. A year after McLeod died in 2002, the agency sent an official communication to DeWald saying, we, the agency, have researched this. There are no trust assets for McLeod. You need to go to state probate court to administer this. So when the government researched it, what were you looking for to determine whether or not it was a trust asset? What would have conveyed to you that it was a trust asset? You know there's a trust asset because there would be a deed to the United States of America, and then importantly attached to that deed there would be something called an acceptance of conveyance, which is a document signed by a government official saying, on behalf of the United States, we agree to take this property into trust on behalf of the United States. So there would be a conveyance deed from the Native American person to the government, and then with that conveyance deed there would be an acceptance from the government, and those two documents would be together. Correct. And absent those two documents appearing in the record, it's your position that no property has been taken into trust. Correct. And I think there's agreement on that, that at the time McLeod died, the property was not in trust. It was in fee. Well, opposing counsel's position is that the government had a mandatory duty to accept the deed because of the prior order, and they had a continuing obligation. What's your response to that, that you just didn't effectuate what you were required to do? Because the judgment has two provisions that I think are important. One, it says that that obligation applies whenever it's possible to do so, and it also says that the secretary can accept or reject as to form. And the problem with it not having been perfected before McLeod died, McLeod's death becomes a dispositive legal event because she died, she didn't have a will, and so that property becomes part of her estate. The wall goes to probate court to try to get the property probated. Can I just, as a matter of clarity, the 81 judgment, when you say the judgment and the provisions you just cited, that's the 81 judgment you're talking about? 1983 judgment. 83, okay, not the 79. So the sisters have different views about this, but is this an amicable dispute or is it, this has tax consequences, I guess, whether you go through probate or whether you're in the trust or is it, what's at the bottom here? It seems to the agency that there's not a lot of love between the two sisters, and the issue that the agency flagged in 2002 and again in 2010 and then 2012 is that essential to any request to put property into trust, the government needs to know who owns this parcel. That's in their regulations, and I think it's common sense that you've got to know who owns this parcel, and only a state probate court can make that decision. There's DeWald, there's Jackson, there's a brother, there's another sister who died and had a couple of children, and that seems to be the universe of potential heirs that have an interest in this property. And so, you know, as we sit here today, it doesn't seem that it would have been appropriate for the agency to, you know, transfer it to Jackson and cut out these other potential heirs. And has the property been probated now? Is it established who it belonged to? No, it hasn't. The probate court's waiting for the federal court to say whether it belongs in trust, right? Correct. And to the federal court's order here makes that finding. There's another piece of litigation, DeWald versus Jackson, that's a separate piece of litigation that raises the same question, and they file a stipulation that if the judge hearing the contempt matter resolved it, then that will also resolve that other piece of litigation. And so this, to me, seems a very unusual case where you can affirm the judgment of the district court, and that affirmance actually allows things to move forward. It allows the probate court to resolve who owns the property, and then the owners of the property can come and apply to the agency to take it into trust, if that's what they want to do. And the district court. So if what the appellant is asking is to put it in trust of the name of the two sisters and then that automatically cuts the other ones out, or how does that work? I would believe so. He's nodding his head. It is seen that that's a very intentional part of this, is that Jackson is trying to do an end run around probate by trying to get a federal court to order the government to take it into property for Jackson and not the other potential heirs. I have a quick question. Assume everything that your brother counsel said to be true, and that the government has, I know this would be a tough assumption for you, the government has dirty hands, the time deadlines were a result of government slowdowns and mismanagement and refusal to file documents, whatever the case may be. Is that a ground for a court of appeals to force a district court to hold the agency in contempt as a legal matter? Because that's what we're talking about here. I don't think so. And the district court judge, if the district court judge thought that the government had acted in bad faith and had dirty hands, I think that would have been reflected in the court's thinking, and there's nothing like that in what the court said at the hearing or included in the order. There's no new arguments here on appeal. I mean these deadlines and refusals of the BIA to take the property into trust over time was well known to the district judge when refusing to enter the contempt order. Correct. And that's part of the standard of review, is that district courts are well equipped to judge whether someone has violated an order of the district court. And I think also importantly, the district court stated quite clearly at the hearing that she wants to set this on the right path, to have the probate court make a decision, that there be an application to the agency. And she said explicitly if the agency, in processing the application, does something that isn't a justified decision to deny it or reject it or ask for information, that she's open to hearing again from the parties about the matter. So it seems affirming moves the matter forward and protects everyone's interests in terms of finding who the owners of the property are and then allowing those people to make a decision about what they want to do in terms of putting the property in trust. Thank you, counsel. Thank you. Good morning, Your Honors. Jack Duran, appearing on behalf of the intervener and also the administratrix of the McLeod Estate in Lake County. May I proceed? Yes, please. Great. Judge Callahan, you had asked a question about the relationships between the sisters and the family. It's a total disaster. They are at each other back and forth, and I think that's really the impetus of a lot of what's going on here. I think to clarify what had happened, I think a review of the 1994 Pacific Regional Director's decision kind of sets forth what happened here, and there is honestly blame on both sides. But at the end of the day, the Department of Interior can only take trust according to the statutes that are out there, and there are certain requirements that are needed to take that into trust. And one of those requirements was the whole tax issue. Those taxes were never paid. She decided to go ahead and contest that. Notice that she didn't contest that until 1994, at which time, also in 1994, the decision came down saying that we're not going to take it into trust for these reasons. At that point in time, she had an obligation, in order to move forward with this, to file a case with the Interior Board of Indian Appeals to perfect her right to file a case in federal court. And she didn't do that. We have the BIA in immigration cases, and then we have the BIA here, so we have a kind of code switch here. Exactly. So if you look at the administrative record that we filed, number 59 clearly states it's been a year since we issued our, or more than 90 days since we issued our decision. There has been no appeal to the Indian Appeals Board. So therefore, she has failed her predecessor. This isn't even Mrs. Jackson here. This all relates back to the mom. So there has not been any exhaustion of her administrative appeals, and she can't at this point in time. The second issue is, on top of that, is the statute of limitations. It's very clear that the six-year statute of limitations does apply to Indian tribes and to Indian lands, and that was directly from a case that this court decided in 2017. That's the Meshua Wapo v. Ryan Zinke. But doesn't the order impose a continuing obligation? Well, and I'm getting to that. Okay. They actually, in this case. You have five seconds to get to it. Yeah, in this case, and this is analogous to that whole continuing obligation, that the court decided that the statute of limitations applies when there is a trust issue, a breach of trust. And it applies especially when the government is being sued. And in that particular case, the tribe was seeking restoration for things that had happened 30 years ago, and this court said, no, we're not going to do it. Six years have passed. If you look at the timelines here from when this started, you're either looking at a 34-year past the statute of limitations or 17 years. But in any event, either or, she's past the statute of limitations. But how can the statute of limitations run from an order that imposes a continuing obligation? Well, it's similar to the fiduciary duty that's owed to Indian tribes. And that's basically what the Meshua Wapo case said, and they were arguing a similar line. But that's in the abstract. This is a concrete document that imposes a continuing obligation as long as it's possible to take the land in trust. So I'm not sure that I'm persuaded that it's the same. Well, the continuing obligation isn't, you know, just an amorphous thing. The continuing obligation has to have sideboards. And that's why we're saying that once the Department of Interior made a determination that something was missing, that that, their continuing obligation ended. Now, one more thing before I go. During the hearing, basically the court, or the United States represented to the court, that after the probate issues, there is still an obligation, and they still will work with the parties for whoever wants to put their parcel in trust with the United States. So they're accepting the obligation. There is a remedy. Thank you so much. Counsel. Rebuttal. I'll be as brief and fast as I can, Your Honors. First of all, you're absolutely right, Your Honor. It's a judgment. It's a permanent judgment in the nature of a permanent injunction. And that stays in effect forever. Or until the court is satisfied that the injunction has been, the purposes of the injunction have been served and dissolves the injunction. But the court retained jurisdiction in this case for the very purpose of ensuring compliance with the government's continuing obligation. That's number one. Number two, the administrative appeal that was taken by Amber Dean Jackson had nothing to do with the request to put the property into trust. She demanded that the government, under the judgment, pay the back taxes. And when the government refused, she took an administrative appeal from that decision. So the administrative appeal has no application or relevance in this case. This was a judgment. The government wanted to take away the secretary's discretion. They wanted to give the Indians the right to void the termination process and to put the property into trust. This is not a dispute among sisters. Amber Dean Jackson, their mother, went in and executed a deed in front of a notary public, David Rapport, her lawyer, explaining to her lawyer that she wanted this property to be returned to the ownership of the government in trust for her two daughters and her wife. Counsel, what's your response to the government's position that the land is not legally in trust until there is a grant deed conveyed and an acceptance of that conveyance in the record? What's your response? My response is they don't have any discretion not to accept the deed. As long as it's not. Is it your position there was a grant deed proffered? Absolutely. The deed's in the record. What date? Pardon me? What date, in your view, was the grant deed proffered? I think I said it before. 88, right? So you're saying that the deed that was offered in 88? January 25th, 1988. It's in the administrative record at page 136. Okay. So that's the deed that you're saying conveyed the property in trust. Yes. All right. So she executed the deed. The government had the obligation. And the only thing in the judgment that prevented the government from accepting the deed was making sure, the government has a right to make sure that she owns the property free and clear, that it's not, there's not tax liens on it, there's not, she hasn't mortgaged it to a bank, and so the government's entitled to a preliminary title report, title insurance, and those things. All right. We understand your argument, counsel. You've exceeded your time. Thank you, Your Honor. Thank you to both counsel. The case just argued and submitted for decision by the court.
judges: Rawlinson, Callahan, S.murphyiii